UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**SHAWNA R. ALLEN**,                                      Civil Case No. 6:11-CV-06322-KI

           Plaintiff,

                                OPINION AND ORDER

              v.

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

           Defendant.


        Alan Stuart Graf, P.C.
        316 Second Rd.
        Summertown, Tennessee  38483

              Attorney for Plaintiff

        S. Amanda Marshall
        United States Attorney
        District of Oregon

Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204

David Morado
Regional Chief Counsel, Region X, Seattle
Scott T. Morris
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
1301 Young Street, Suite A-702
Dallas, Texas  75202

        Attorneys for Defendant

KING, Judge:

Plaintiff Shawna Allen brings this action pursuant to section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I reverse the decision of the Commissioner and

remand for further proceedings.

## BACKGROUND

Allen filed applications for DIB and SSI on August 26, 2009.  The applications were

denied initially and upon reconsideration.  After a timely request for a hearing, Allen, represented

by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on March 15,

2011.

On April 14, 2011, the ALJ issued a decision finding Allen not disabled within the

meaning of the Act and therefore not entitled to benefits.  This decision became the final decision

Page 2 - OPINION AND ORDER

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

August 12, 2011.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but

who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

cause death or to last for a continuous period of at least twelve months.  42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for

determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is

carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  Parra v.

Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ

determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is

engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two

and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance. Id. "[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found Allen met the insured status requirements through December 31, 2011. He also concluded she had not engaged in any substantial gainful activity ("SGA") since April 1, 2002, the alleged onset date. He concluded Allen suffered from polycystic ovary endometriosis, chronic pelvic pain, and recurrent urinary tract infections ("UTI"). He also mentioned in his findings that Allen had undergone a cystoscopy with hydrodistention of her bladder, and that her physician discovered a decreased bladder capacity consistent with interstitial cystitis ("IC").[1] The ALJ found that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

The ALJ concluded Allen had the residual functional capacity ("RFC") to perform less than the full range of sedentary work, but could stand or walk two hours and could sit six hours

---

[1]IC is "a complex, chronic bladder disorder characterized by urinary frequency, urinary urgency, and pelvic pain." Social Security Ruling 02-2p.

out of an eight-hour day. He found she could lift and/or carry ten pounds occasionally, could not

work around hazards or heights, and needed continuous access to a restroom. Based on this

RFC, he determined she could not perform her past relevant work as a waitress or customer

service clerk, but could work as an order clerk, information clerk, and survey worker.

## FACTS

Allen, who was 16 years old at the time of her alleged onset date and 25 at the time of the

hearing, reports disability from pelvic pain and IC. She has a high school degree, and has

worked part-time as a waitress, mushroom picker, custom framer, telemarketer, and in customer

service. She worked during her high school years, but has never held a full-time job.

She asserts that she has been experiencing urinary urgency problems since the age of 13,

but her medical records from that time reflect a single complaint of these symptoms at the age of

14, when Donna Byrne, M.D., prescribed a course of antibiotics. Allen did not complain again

about pelvic pain or bladder issues until she was 18 years old; she was treated for acne, thoracic

pain, and warts in the intervening years. Dr. Byrne diagnosed her, at age 18, with polycystic

ovaries and acute cystitis (bladder infection) and, with respect to the latter diagnosis, prescribed a

course of antibiotics and told Allen to "follow up if worsens or persists." Tr. 257.

Allen did not follow up until two years later when she appeared in the ER on April 21,

2006–then 20 years old–complaining of right lower quadrant abdominal discomfort "since the

age of 13." Tr. 369. When asked why she waited seven years, she told the doctor the symptoms

had worsened over the last few days. She also complained of irregular periods, nausea, vomiting,

and constipation. She denied dysuria–difficult or painful discharge of urine--but reported

sometimes her "bladder is numb." Id. The ER physician reported "[h]er history and physical

exam is not consistent with any acute serious pathology.  I think the patient is medically stable for outpatient workup."  Tr. 370.

A month later, she returned to Dr. Byrne complaining about irregular periods, pelvic pain during intercourse, and urinating sometimes several times in an hour.  Dr. Byrne wondered whether the bladder issues might be IC, or instead caused by an ovarian cyst.  Allen reported she had no insurance and would rather wait on obtaining an ultrasound of the ovary.  Dr. Byrne reported that she would, "for now, . . . send the pap smear, will check an FSH [follicle-stimulating hormone], LH [luteinizing hormone], as she is concerned about possible early menopause and will check a TSH [thyroid-stimulating hormone] and blood work and will contact her with results and go from there."  Tr. 253.

Instead, Allen established care at the Springfield Family Practice Group on July 28, 2006, complaining of bladder problems, and reporting she "has had lots of tests done and doesn't know what they were or what they meant, and that that is why she is changing PCPs."  Tr. 406.  She reported having "a lot of things wrong with me"–bladder issues, nausea, irregular menstruation, headaches at the base of her skull, and she felt sick all the time.  Tr. 406.  Sally Marie, M.D., referred her to Brady R. Walker, M.D., for her bladder issues, and arranged for a CT scan.

The CT scan on August 7 revealed no abnormalities.  Allen returned to the Springfield Family Practice Group on August 17, now complaining of chest pains.  Jeffrey Beckwith, M.D., found only normal results and opined, "My guess is that this is going to a psychophysiologic disorder."  Tr. 405.  Allen saw Dr. Marie again on August 22, after having done some reading about polycystic ovary disease, and asked for a referral to a specialist.  She asked for a prescription for Percocet for head, ovary, and back pain.  Dr. Marie gave her a prescription with

no refills, and referred her for a psychiatric evaluation and to a gynecologist, Julie Haugen, M.D., to evaluate for polycystic ovary disease.

Upon Dr. Marie's referral, Dr. Walker examined Allen on August 23, who complained of nausea, occasional vomiting, straining to urinate (which reportedly began at 13 and had worsened over the last two years), and having to urinate every 15 minutes to two hours. Dr. Walker provided samples of Detrol LA and VESIcare.

On October 6, Dr. Haugen examined Allen for her infrequent menstrual flow, hirsutism, acne, and diffuse abdominal pain. She "also has some urinary symptoms of overactive bladder and some pain in her bladder." Tr. 286. Dr. Haugen undertook a "fairly extensive laboratory evaluation," which reflected results consistent with polycystic ovarian syndrome.

Allen reported to Dr. Walker on November 7 that the medications had not improved her symptoms of urinary straining and hesitancy. Dr. Walker recommended cystoscopy with possible urethral dilatation.

On November 20, Dr. Walker undertook a cystocopy and urethral dilatation and found Allen had a small bladder capacity and mild evidence of urethral stenosis.

Allen saw gastroenterologist William M. Kelley, M.D., for her abdominal pain in December of 2006. He guessed with her "constellation of dysphagia, constipation, and nausea, I suspect a global motility disorder" but also suspected "some psychological overlay as well." Tr. 317. He prescribed Zelnorm. She was to come back in a month, but did not return. When a voicemail message was left for her to provide a progress report, Allen did not return the call.

Dr. Marie examined Allen on January 24, 2007 about her acne. Allen complained that the specialists were not returning her phone calls. She was "distraught about her dry skin." Tr.

403.   On May 5, Dr. Marie examined Allen for back pain in the lower right side.  Allen was

working as a waitress.  Dr. Marie prescribed ibuprofen and strengthening exercises.

Allen returned to Dr. Haugen on June 5, 2007, eight months after her first visit with Dr.

Haugen, continuing to complain of intermittent, diffuse abdominal pain on the a scale of 3-4 out

of 1-10, but sometimes shooting up to 10.  She wanted to know if she had endometriosis because

of a family history.  She reiterated concerns about it being difficult to initiate a stream of urine

and urinary frequency.

Allen returned to the Springfield Family Practice Group with symptoms of strep throat in

July 2007.  She did not complain about any other medical problems.

On August 31, Dr. Haugen removed two very small areas of endometriosis.

Dr. Marie examined Allen on October 8 because Allen had found a big lump near her

uterus.  The big bump was her cervix.

On December 11, 2007, Allen returned to the gastroenterologist Dr. Kelley, a year after

her last visit to him.  He assessed her low pelvic pain, and opined that it was not due to her GI

tract.  She asked for a second opinion.

The Springfield Family Practice Group treated Allen for a UTI on December 29.  The

urinary frequency started the night before, with dysuria that morning.  The nurse practitioner

prescribed an antibiotic.  Allen followed up with Dr. Marie on January 9, 2008, complaining that

the UTI was not treated.  Dr. Marie prescribed Septra DS.  Allen reported to Dr. Marie in

February that she had no "severe problems with peeing but feels a little weird."  She reported

"[s]ome pain with urination.  Still has to push it out sometimes, lean forward to urinate."  Tr.

391.  Two weeks later–on February 13–she reported "funny feelings" when she urinated.  Her labs returned negative.

On February 26, Allen returned to Dr. Walker reporting her recent UTI and asking for a reassessment of her symptoms.  Allen complained of back pain and expressed concern about a kidney stone or kidney infection.  Dr. Walker noted her urinalysis was crystal clear and that he was interested in treating Allen conservatively.  Allen underwent an ultrasound, which reflected "no upper tract source of urologic abnormalities for her pain[.]"  Tr. 275.

On March 3, Allen asked Dr. Marie for pain medication for chronic abdominal pain.  Dr. Marie prescribed an antidepressant.

Allen returned to Dr. Walker on March 11, reported pain while urinating had improved, but requested a new opinion regarding her chronic pelvic pain.

Dr. Marie increased Allen's antidepressant dosage and ran some tests in response to Allen's continuing complaints of pelvic pain in May 2008.

On October 7, she returned to Dr. Haugen complaining of chronic pelvic pain.  She reported her research of IC and "feels like she has every symptom."  Tr. 278.  She complained of needing to push hard to void, with a reluctant stream, and that Dr. Walker "has been unable to find a reason for this complaint."  Tr. 278.

Allen returned again to Dr. Kelley reporting blood in her stool and positional pelvic pain.  Dr. Kelley thought colitis was possible and referred her for a colonoscopy, which she underwent on October 29, 2008.  The test returned normal findings.

On December 15, Allen established care with Lana Gee-Gott, M.D., at the Springfield Family Practice Group.  At that time, Allen complained of toe fungus and hard skin on her feet.

Page 10 - OPINION AND ORDER

She specifically responded that she had no abdominal pain and she did not complain about any urination-related problems.

Allen went to the ER on December 20 with burning, frequency and urgency with urination.  She was diagnosed with a bladder infection.  She was given a prescription for vicodin and cipro, and pyridium.

She returned to the ER on January 9, 2009 complaining about a UTI; Allen described the symptoms as mild.

At a follow up with Dr. Gee-Gott on January 16, Allen reported the UTI had resolved, but noted occasional dysuria.

Allen returned to the ER on February 6 complaining of chest pain.

Allen was examined by an internist at OHSU on February 17, Stacie Carney, M.D., who reported to Dr. Gee-Got that she had referred Allen to urogynecology at OHSU and ordered some labs.  In the appointment, Allen complained about pelvic pain, and bladder and bowel problems, along with many other symptoms, such as fatigue, memory problems, muscle spasms, sciatica, nerve problems, itching skin, sensitivity to light, and insomnia.  She reported having various jobs for five or six months at a time, but that her nausea and her memory affect her ability to work.  Tr. 460.  She used medicinal marijuana every other day.  Dr. Carney reported Allen "says she recognizes that she may not find a unifying diagnosis for her symptoms, and that some of her recovery will need to focus on learning to live functionally with her symptoms."  Tr. 462; 408.

Mary A. Denman, M.D., performed another cystoscopy with hydrodistention on March 30, 2009.  Dr. Denman diagnosed chronic IC.

On May 12, the Springfield Family Practice Group treated Allen for hives she had developed in response to a medication she had taken after the cystoscopy.  Dr. Gee-Gott recommended she stay off the medication and return to the office if she wanted to take a less conservative approach.

On August 16, 2009, she appeared in the ER for urinary frequency, dysuria, and urgency. She was diagnosed with an acute UTI and prescribed a course of antibiotics.  She followed up with Dr. Gee-Got four days later, reporting Cipro to be ineffective.  She obtained a prescription for Bactrim DS.

Allen obtained a prescription for medical marijuana on August 27, 2009 for the IC and "constant bladder infection x6 - 1 yr."  Tr. 417.

Dr. Denman, who had performed the last cystoscopy in March, wrote a letter on December 29, 2009 explaining that she last saw Allen in April, when she reported relief from the hydrodistention procedure.  According to Dr. Denman's telephone records, Allen's last flare was in September.  Dr. Denman explained that "IC is a relapsing/remitting condition with variable course in different people."  Tr. 445.

Allen did not seek treatment from Dr. Gee-Got for any other bladder-related pain until a year later, on August 16, 2010.  Tr. 523.  Although there is no detail in the record, at a previous physical in April of that year, Dr. Gee-Got had started Allen on oxybutynin, which is used to control urgent, frequent, or uncontrolled urination.  At the August appointment, Allen reported the medication was helping, but making her sleepy.  She also complained of depression and obtained a prescription for Celexa.  The last medical record is from January 12, 2011, in which Allen was treated by a physician's assistant for dysuria.  Allen obtained a prescription for Cipro.

Allen underwent a psychological evaluation on January 27, 2011.  She reported no
psychological problems but that her physical problems "weigh on her."  Tr. 502.  She reported
using medical marijuana once in the evening for pain.  The psychologist opined Allen "had very
good attention and concentration for test and interview material," tr. 504, and did "not appear to
have clinically significant deficits in either general intelligence or general memory functioning."
Tr. 506.  The examiner thought she had no impairment in ability to "sustain concentration and
attention, and persist," although he commented, "Physical pain and related health problems seem
to be primary in this area."  Id.

## DISCUSSION

Allen challenges the ALJ's treatment of her IC diagnosis, her testimony, and Dr. Gee-
Got's opinion about Allen's functional limitations.

I.    <u>Whether Allen's IC Constitutes a Severe Impairment</u>

The ALJ indicated polycystic ovary endometriosis, chronic pelvic pain, and recurrent
UTIs were severe impairments, but neglected to identify Allen's IC as a severe impairment.  It is
not clear whether this was intentional or not.  As the Commissioner points out, the ALJ expressly
discussed Allen's IC in the context of her other severe impairments:  "Pursuant to bladder pain, a
cystoscopy with hydrodistention was performed in March 2009, finding a decreased bladder
capacity, consistent with interstitial cystitis."  Tr. 14.  Where Allen's IC was established through
"signs, symptoms, and medically acceptable clinical or laboratory findings," it was error for the
ALJ to omit IC as a severe impairment, if that is what he did.  <u>Ukolov v. Barnhart</u>, 420 F.3d
1002, 1005 (9th Cir. 2005).

However, given the overlap between the symptoms of IC and the other impairments he *did* identify as severe–namely chronic pelvic pain, endometriosis, and recurrent UTIs–and that the ALJ in effect considered the functional limitations of IC in his analysis–needing continuous access to a restroom–any error was harmless. See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007); see also SSR 02-2p ("The symptoms of IC are similar to those of other disorders, such as acute urinary tract or vaginal infections, . . . endometriosis, . . . ").

Allen disputes that the ALJ's limitation to continuous access to a restroom adequately accounts for the severity of her IC. She reports that some people experience the need to urinate 60 times a day. Whether the RFC adequately accounts for the severity of *Allen's* symptoms, however, is dependent on whether the ALJ correctly assessed Allen's credibility with respect to the severity of her symptoms, which I address next.

In sum, any error the ALJ made in identifying Allen's severe impairments was harmless.

II.   Allen's Credibility

Allen testified at the hearing that she left previous work because she "couldn't physically handle" the waitress job, tr. 34, because of the "big trays," tr. 56, and the shift for her other job as a backup waitress and busser was eliminated. Tr. 35. She testified that it was actually "a lot easier" to be busy and work a standing job like washing dishes because it took her "mind off the way I feel, the pain[.]" Tr. 56. Yet, she also testified she does not walk because she feels pain and she has to go to the bathroom. She also "has pain in her pelvic area" from sitting. Tr. 40. She plans her day around bathrooms and if she thinks it is going to be "too difficult or embarrassing to have to try to –for people to accommodate, then I won't even try going and doing something." Tr. 43. She spends her day at home, she hangs out with her roommate and

watches movies or plays cribbage.  On her bad days, she needs to urinate every fifteen minutes, and it sometimes take five to ten minutes to void her bladder.  She has bad days about five days a week.  On good days, she goes to the bathroom every hour.  She testified she has had about a dozen UTIs in the last three years.  She described her pain as "unbearable and uncomfortable" and as affecting her ability to concentrate, remember and complete tasks.  Tr. 205-07.

The ALJ concluded, after reviewing the record, that Allen's impairments could be expected to cause some of her symptoms, but he questioned the "intensity, persistence and limiting effects of her symptoms" to the extent they conflicted with the RFC he assessed.  Tr. 15. He discussed the medical evidence and concluded the mostly normal and mild findings drew into question Allen's subjective complaints.  He noted the possibility of secondary gain; she was concerned about continuation of her health insurance were she to divorce her estranged husband, she contemplated bankruptcy due to medical bills, and her boyfriend complained of "great strain" on their finances.  Tr. 199.  The ALJ also believed Allen's daily activities conflicted with her testimony.  Allen performed all activities of daily living unassisted, including personal care, driving, chores, cleaning, grocery shopping, gardening, and cooking.  She had friends, lived with a roommate, and played pool weekly.  Finally, the ALJ referenced Allen's normal psychological findings, including a finding of good attention and concentration, ability to complete the three hour assessment, and inconsistency between her memory and concentration complaints and the test results.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce

some degree of symptom.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  The

claimant is not required to show that the impairment could reasonably be expected to cause the

severity of the symptom, but only to show that it could reasonably have caused some degree of

the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the

claimant's testimony regarding the severity of the symptoms.  Id.  The ALJ "must specifically

identify the testimony she or he finds not to be credible and must explain what evidence

undermines the testimony."  Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001).  General

findings are insufficient to support an adverse credibility determination and the ALJ must rely on

substantial evidence.  Id.  "[U]nless an ALJ makes a finding of malingering based on affirmative

evidence thereof, he or she may only find an applicant not credible by making specific findings

as to credibility and stating clear and convincing reasons for each."  Robbins v. Soc. Sec.

Admin., 466 F.3d 880, 883 (9th Cir. 2006).

        Allen takes issue with the ALJ's reliance on the normal and mild medical findings, noting

that IC is a diagnosis of exclusion.  Allen provides background information on IC from the

National Institute of Health explaining that "[t]he condition is usually diagnosed by ruling out

other conditions[.]"  Pl.'s Op. Br. 12.  I note the Social Security's own guidance regarding IC

explains "the diagnosis is one of exclusion.  A physician must rule out other conditions before

making a diagnosis of IC because there is currently no definitive test to identify IC."  SSR 02-2p.

        Although the ALJ cannot reject subjective pain testimony solely because it was not fully

corroborated by objective medical evidence, normally medical evidence may be at least one

relevant factor in determining the severity of the pain and its disabling effects.  Rollins v.

Massanari, 261 F.3d 853, 857 (9th Cir. 2001).  However, here, where the Social Security

Administration's own guidance explains that IC is a diagnosis of exclusion, medical test results

showing, for example, an unremarkable colonscopy, mild findings on the cystoscopy and urethral

dilatation procedure, normal appearing bladder, "completely benign" abdominal examination,

and normal renal ultrasound, do not shed light on Allen's credibility.  Rather, according to the

Social Security Administration's own policy, a diagnosis is based on symptoms of urinary

urgency or frequency, pain in the bladder and surrounding pelvic region, and "[a]bsence of other

disorders that could cause the symptoms," among other factors.  SSR 02-2p.  Where the cause of

IC is unknown, treatments are directed at relief of symptoms, and the symptoms are subjective,

but where a physician diagnosed IC, it was improper for the ALJ to question Allen's subjective

complaints because they were not consistent with the mild and normal findings in the medical

record.

 With respect to the possibility of secondary gain as a motivation for Allen's application

for social security benefits, evidence that a claimant is seeking benefits for reasons other than

disabling impairments may undermine credibility.  See Gaddis v. Chater, 76 F.3d 893, 896 (8th

Cir. 1996) (claimant said he planned to work only until his lawsuit settled).  Here, however,

where the evidence reflects only upon Allen's financial predicament, without shedding light on

her functional abilities, any possibility of secondary gain is not a clear and convincing reason to

question her credibility.  See Ratto v. Sec'y, Dept. of Health and Human Servs., 839 F. Supp.

1415, 1428-29 (D. Or. 1993).

 Nevertheless, the fact that the ALJ improperly considered some reasons for finding

Allen's credibility undermined does not mean that the ALJ's entire credibility assessment is

improper.  Batson, 359 F.3d at 1197.  The ALJ noted that Allen reported improvement in her

symptoms after the hydrodistention in March 2009 and reported the medication was effective in August 2010.  It was appropriate for the ALJ to consider this evidence in the medical record in assessing Allen's complaints about the severity of her symptoms, together with other evidence in the record.

The ALJ additionally considered the psychologist's finding that Allen exhibited clear speech, logical thought process, and very good attention and concentration during the testing. Her IQ was average, and she had mild or no impairments with regard to work.  If her urgency and pelvic pain affected her ability to concentrate in the ways she described, one would expect that to be reflected in the test results or the psychologist's observations.  Indeed, the ALJ noted Allen "was capable of completing the entire assessment, lasting three hours, suggesting she could perform some type of work."  Tr. 16.  Finally, "[a]lthough the claimant alleged problems with understanding, memory, completing tasks, concentration and following instructions, the evidence did not support any cognitive dysfunction or signify a history of psychiatric medication prescriptions, hospitalization or mental decompensation."  Tr. 17; see Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001) (a tendency to exaggerate symptoms is another valid reason to support a negative credibility finding).

Allen disputes that her daily activity level is as telling of her capacity as the ALJ believed. Although less persuasive, and certainly not sufficient on its own, the ALJ did not err in questioning Allen's need to lie down and the limitations caused by her "unbearable pain."  For example, when asked during the hearing about how often she needs to lie down because of pain, she testified, "Well, seeing as I don't do much, it's quite often."  Tr. 54.  She played pool weekly,

visited family, and was capable of taking care of herself and the household.  This evidence tends

to support the ALJ's conclusion that Allen's daily activities are inconsistent with her complaints.

The Commissioner identifies additional reasons not relied on by the ALJ.  For example,

the lack of objective medical evidence to support Allen's statement that she had difficulty with

reading comprehension and her inconsistent statements about her use of medical marijuana.

However, the court cannot "affirm the decision of an agency on a ground that the agency did not

invoke in making its decision."  Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1054 (9th

Cir. 2006) (internal quotation omitted).  I do not consider these other possible grounds for

finding Allen not entirely credible.

In short, the ALJ's credibility assessment, based solely on those reasons identified in his

opinion, other than the two items I identified above, are clear and convincing and supported by

substantial evidence in the record.

III.   Residual Functional Capacity

While the ALJ did an adequate job of addressing Allen's allegations of pain, he simply

did not address the fact that Allen plans her day around the bathroom and sometimes needs to use

the bathroom every 15 minutes.  He did not directly address her testimony, but accepted the

testimony of her now ex-boyfriend that Allen needed immediate access to the bathroom by

stating, "I agree the record supports the necessity of a ready access bathroom and this limit has

been included in the residual functional capacity assessment."  Tr. 16.  Neither the ex-boyfriend's

testimony, nor the ALJ's opinion, pinpoints exactly how many bathroom breaks Allen would

need in an eight-hour day.

The VE testified that Allen would not be able to find work if she needed to use the restroom every 30 minutes, taking five minutes at a time, on a daily basis.

While I question her testimony, given Allen's propensity to exaggerate as described above, and some of the inconsistent medical evidence,[2] the ALJ must address this issue in the first instance. Given the VE's testimony, a functional limitation requiring continuous access to a restroom is insufficient to address Allen's need to *use* the restroom and the amount of time carved out from her workday to accommodate her need.

IV.     Medical Evidence

Allen challenges the ALJ's decision to give "some weight" to Dr. Gee-Gott's functional assessment. Dr. Gee-Gott opined on March 8, 2011 that Allen could lift 10 pounds occasionally, could stand and walk with normal breaks "at least" two hours in an eight-hour day and could sit with normal breaks for "less" than six hours in an eight-hour day. She did not believe any of Allen's medications caused side effects or limited her activities. She believed Allen's IC, chronic pelvic pain, and endometreosis would cause her to miss more than two days of work a month. The ALJ gave significant weight to Dr. Gee-Gott's opinion regarding Allen's limitations in sitting, standing/walking, and lifting. Nevertheless, he concluded Dr. Gee-Gott's opinion that Allen would miss at least two days of work a month, and that Allen "may" need to lie down

---

[2]For example, the record reflect a single complaint of urinary frequency at 14, with no other complaints about pelvic pain or frequency until 18. The record also appears to contradict her report of twelve UTIs in the last three years. Counting both bladder infections and UTIs, I come up with a total of eight in the entire medical record beginning in 2000. She sought treatment for one in 2011 (Tr. 520), none in 2010, one in 2009 (Tr. 341), two in 2008 (Tr. 330, 393), and one in 2007 (Tr. 395). This evidence contradicts the medical marijuana recommendation form which suggests bladder infections six times in a year. Furthermore, and notably, there is no evidence Allen left a job because of her urinary frequency issues.

Page 20 - OPINION AND ORDER

during the day, was not supported by the record.  Dr. Gee-Gott gave no explanation for these

conclusions.  If these opinions were based on Allen's subjective complaints, the ALJ asserted

"imaging has been unremarkable and treatment limited."  Tr. 17.

The weight given to the opinion of a physician depends on whether the physician is a

treating physician, an examining physician, or a nonexamining physician.  More weight is given

to the opinion of a treating physician because the person has a greater opportunity to know and

observe the patient as an individual.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  If a

treating or examining physician's opinion is not contradicted by another physician, the ALJ may

only reject it for clear and convincing reasons.  Id. (treating physician); Widmark v. Barnhart,

454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another

physician, the ALJ may not reject the opinion without providing specific and legitimate reasons

supported by substantial evidence in the record.  Orn, 495 F.3d at 632; Widmark, 454 F.3d at

1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial

evidence to reject the opinion of a treating or examining physician.  Widmark, 454 F.3d at 1066

n.2.

To the extent the ALJ rejected Dr. Gee-Gott's opinion due to the mild and normal

findings in the medical record, this was error as I have explained above.  However, an ALJ is not

required to accept the opinion of a physician, even a treating physician, if the opinion is "brief,

conclusory, and inadequately supported by clinical findings."  Batson, 359 F.3d at 1195.  Dr.

Gee-Gott's statement that Allen "may need to lie down–have not asked her how long she would

need to lay down" is too general to require the ALJ to give it weight and the doctor gave no

explanation for her decision to check "More than 2 days per month" in answer to a question

about how many days Allen would be unable to work. Accordingly, the ALJ gave clear and convincing reasons to find Dr. Gee-Gott's opinion unpersuasive.

Allen additionally argues that, in effect, Dr. Gee-Gott found Allen unable to work because she opined Allen could sit *less* than six hours, and stand for two hours; two plus *less* than six does not make an eight-hour workday. However, Dr. Gee-Gott found Allen capable of standing "at least" two hours, providing for the possibility of standing more than two hours. Tr. 537. The ALJ did not err.

V.      Remedy

Based on my finding the ALJ failed to specifically address Allen's testimony regarding the frequency with which she needs to use the restroom, and the fact that a limitation to access to the restroom does not adequately address the need to use a restroom, I find a reversal and remand for additional evidence or hearing is required. I note Allen's history of sporadic treatment for her UTIs and her history of leaving jobs for reasons unrelated to her medical needs suggests issues need to be resolved before a determination of disability can be made. Additionally, the need for further VE testimony about how many bathroom breaks an employee may take require remand for further development of the record. McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002) (identifying three factors to consider in deciding whether to award benefits, one of which is whether there are issues to be resolved).

///


///


Page 22 - OPINION AND ORDER

**CONCLUSION**

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) for further development of the record

as explained above.  Judgment will be entered.

IT IS SO ORDERED.

Dated this _____9th_____ day of October, 2012.


                                    ___/s/ Garr M. King_____
                                    Garr M. King
                                    United States District Judge

Page 23 - OPINION AND ORDER